DAVID R. ZARO (CA BAR NO. 124334)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
515 South Figueroa Street, Ninth Floor
Los Angeles, California 90071-3309
Phone: (213) 622-5555
Fax: (213) 620-8816
E-Mail: dzaro@allenmatkins.com

GEORGE A. DAVIS (NY BAR NO. 2761)
ANDREW M. TROOP (NY BAR NO. 04556320)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY 10281
Phone: (212) 504-6000
Fax: (212) 504-6666
E-Mail: george.davis@cwt.com
        andrew.troop@cwt.com

Counsel for Lehman Commercial Paper Inc.,
as First Lien Administrative Agent for the First Lien Lenders

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>LBREP/L-SunCal McAllister Ranch LLC,<br><br>Debtor. | Case No. 8:08-15637 (ES)<br><br>Chapter 11<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF LEHMAN COMMERCIAL PAPER INC., AS FIRST LIEN ADMINISTRATIVE AGENT FOR THE FIRST LIEN LENDERS, FOR ENTRY OF AN ORDER PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE AND RULES 4001 AND 9014 OF THE BANKRUPTCY RULES GRANTING THE FIRST LIEN LENDERS RELIEF FROM THE AUTOMATIC STAY TO FORECLOSE ON THEIR SECURED COLLATERAL<br><br>Date: October 28, 2008<br>Time: 8:30 a.m.<br>Ctrm: SA |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

808092.01/LA

# TABLE OF CONTENTS

| | Page |
|---|---|
| Preliminary Statement | 2 |
| Jurisdiction | 4 |
| Procedural Background of Involuntary Cases | 4 |
| The SunCal Companies | 5 |
| SunCal's Credit Agreements | 5 |
|     A. The First Lien Credit Agreement | 6 |
|     B. The Second Lien Credit Agreement | 7 |
|     C. The Third Lien Credit Agreement | 8 |
|     D. The Intercreditor Agreement | 8 |
|     E. Other Secured Claims of the SunCal Companies | 9 |
|     F. SunCal's Default Under the Credit Agreements and the First Lien Lenders' Foreclosure Action | 9 |
|     G. Value of Collateral | 11 |
| Relief Requested and Reasons Therefor | 12 |
|     H. Cause Exists to Grant the First Lien Agent Relief from the Automatic Stay | 13 |
|         a. The First Lien Lenders' Interest In the Collateral Is Not Being Adequately Protected and Is Not Likely to Be Protected by the Involuntary Debtors | 13 |
|         b. The Involuntary Debtors Lack Equity In the Collateral and No Reorganization Is In Prospect; Stay Relief Thus Is Appropriate Under Section 362(d)(2)(B) of the Bankruptcy Code | 14 |
|         c. The Second Lien Lenders' Bad Faith Filings Constitute "Cause" to Grant the First Lien Agent Relief from the Stay | 15 |
| Notice | 17 |
| No Prior Application | 17 |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

808092.01/LA

(i)

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Gunnison Ctr. Apts., LP*,
   320 B.R. at 400................................................................................................17

*In re Rule, Ltd.*,
   41 B.R. 153 (Bankr. D. Haw. 1984)..................................................................17

*In re Springs Hospitality, Inc.*,
   2006 WL 2458679 *8 (Bankr. D. Colo. 2006)..................................................16

*Springs Hospitality*,
   2006 WL 2458679 at *4.....................................................................................17

*Stewart v. Gurley*,
   745 F.2d 1194 (9th Cir. 1984)...........................................................................14

*United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re*
   *Timbers of Inwood Forest Assocs., Ltd.)*,
   484 U.S. 365 (1988).................................................................................. 14, 15

**Statutes**

11 U.S.C. § 1129 ................................................................................................... 15

11 U.S.C. § 362(d).......................................................................................... 12, 14

11 U.S.C. § 362(d)(1)............................................................................................ 16

11 U.S.C. §101 ........................................................................................................ 2

11 U.S.C. §362(a)................................................................................................. 11

11 U.S.C. §362(d).................................................................................................. 12

11 U.S.C. §362(d)(2)(A) ........................................................................................ 15

11 U.S.C. §506(c).................................................................................................. 13

11 U.S.C. 361 ........................................................................................................ 14

28 U.S.C. §§ 157 and 1334 .................................................................................... 4

28 U.S.C. §§1408 and 1409 ................................................................................... 4

28 U.S.C. §157(b)(2).............................................................................................. 4

**Rules**

Bankruptcy Rule 4001........................................................................................... 12

Bankruptcy Rule 4001 and 9014 ............................................................................ 2

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

808092.01/LA

Lehman Commercial Paper Inc. ("LCPI" or the "First Lien Agent") in its capacity as first lien administrative agent to a syndicate of financial institutions (i) who are parties (collectively, the "First Lien Lenders") to that certain First Lien Credit Agreement, dated as of January 19, 2006 (as amended) (the "First Lien Credit Agreement"), among LBREP/L-SunCal Master I LLC ("SunCal"), the First Lien Lenders, Lehman Brothers Inc. ("LBI"),[1] and the First Lien Agent, and (ii) for whose favor and benefit certain guaranties were issued by LBREP/L-SunCal McAllister Ranch LLC ("SunCal McAllister"), LBREP/L-SunCal McSweeny Farms LLC ("SunCal McSweeny"), and LBREP/L-SunCal Summerwind Ranch LLC ("SunCal Summerwind") (the "Debtor Guarantors," together with SunCal, the "Involuntary Debtors") each of which are wholly owned subsidiaries of SunCal, by and through its undersigned attorneys, files this Memorandum of Points and Authorities (the "Memorandum") in support of the Motion (the "Motion") for entry of an order pursuant to section 362(d) of Title 11 of the United States Code, 11 U.S.C. §101, *et seq.*, (the "Bankruptcy Code"), and rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") granting the First Lien Lenders relief from the automatic stay to foreclose on their secured collateral held by each of the Involuntary Debtors.[2] In support of the Motion, the First Lien Agent respectfully represents as follows:

### Preliminary Statement[3]

1. The involuntary cases currently before this Court are most properly characterized as an improper (indeed, bad faith) attempt by the Second Lien Agent to utilize the provisions of the Bankruptcy Code to stall the First Lien Agent's exercise of

---

[1] LBI was the arranger under each of the three Credit Agreements (as defined below).
[2] LBREP/L-SunCal Patterson Ranch LLC ("SunCal Patterson"), a non debtor entity, is also a wholly-owned subsidiary of SunCal. SunCal's equity interests are directly owned by – SCC Ranch Ventures LLC and LBREP Lakeside SC Master I LLC (the "SunCal Parents," together with SunCal, the Debtor Guarantors and SunCal Patterson, the "SunCal Companies").
[3] Capitalized terms used in this Preliminary Statement section, but not otherwise defined, shall have the meanings ascribed to them in the Memorandum.

state law rights and remedies, on behalf of the First Lien Lenders, under the First Lien Credit Agreement for the following non-exhaustive list of reasons:

- The involuntary cases were filed in violation of the parties' Intercreditor Agreement, solely to prevent the First Lien Agent from foreclosing on the First Lien Lenders' secured Collateral – consisting, in large part of the SunCal Real Property.
- There is no credible basis for the Second Lien Agent to have believed that these Involuntary Debtors can be reorganized. The Involuntary Debtors currently have little or no unencumbered cash and are currently unable to generate cash. As a result, they cannot administer their cases, or reorganize their affairs, under chapter 11 of the Bankruptcy Code.
- The satisfaction of all the criteria necessary for relief from the automatic stay is present: (i) the SunCal Real Property continues to diminish in value; (ii) the Involuntary Debtors are unable to provide the First Lien Lenders with any adequate protection; (iii) the Involuntary Debtors have no equity in the SunCal Real Property, as the value of the property is far less than the First Lien Lenders' secured claims; and (iv) there is no reasonable basis upon which to conclude that the Involuntary Debtors will be able to reorganize in a reasonable time.
- The involuntary cases were caused to be filed by the Second Lien Agent virtually on the eve of the First Lien Lenders' scheduled foreclosure sales of their secured Collateral.

2. In light of these facts and circumstances, well known to the Second Lien Agent at the time it caused the Involuntary Petitions to be filed against each of the Involuntary Debtors, cause exists to grant stay relief under section 362(d) of the Bankruptcy Code.[4]

---

[4] It is important to note that the Involuntary Debtors are aware of the relief requested in the Motion and have given every indication that they will not oppose it.

## Jurisdiction

3. The Court has jurisdiction to consider the Motion and the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

## Procedural Background of Involuntary Cases

4. On September 10, 2008 (the "September 10th Petition Date"), Gramercy Warehouse Funding I LLC ("Gramercy" or the "Second Lien Agent"), as second lien administrative agent to a syndicate of financial institutions (collectively, the "Second Lien Lenders") who are parties to that certain Second Lien Credit Agreement, dated as of January 19, 2006 (as amended) (the "Second Lien Credit Agreement"), among SunCal, the Second Lien Lenders, LBI and the Second Lien Agent,[5] filed an involuntary petition (the "SunCal Petition") for chapter 11 relief against SunCal pursuant to section 303 of the Bankruptcy Code.

5. On September 11, 2008 (the "September 11th Petition Date," collectively with the September 10th Petition Date, the "Involuntary Petition Dates"), Gramercy, in its capacity as agent for the Second Lien Lenders, in conjunction with certain trade creditors filed involuntary chapter 11 petitions (the "Guarantor Petitions," collectively with the SunCal Petition, the "Involuntary Petitions") against each of the Debtor Guarantors.[6]

---

[5] Prior to February 14, 2008, LCPI was administrative agent under the First Lien Credit Agreement, the Second Lien Credit Agreement and Third Lien Credit Agreement (as defined herein) (collectively, the "Credit Agreements"). On February 14th, however, LCPI resigned as administrative agent under the Second Lien Credit Agreement and Third Lien Credit Agreement. The Second Lien Lenders appointed Gramercy as the administrative agent under the Second Lien Credit Agreement, and the Third Lien Lenders (as defined herein) appointed Square Mile Structured Debt (One) LLC and Square Mile Structured Debt (Two) LLC, (collectively, "Square Mile" or the "Third Lien Agent") as third lien administrative agent under the Third Lien Credit Agreement.

[6] Specifically, on the September 11th Petition Date, (i) Gramercy, John D. Scripter d/b/a Mason Plus and Klassen Corporation filed an involuntary petition against SunCal McAllister; (ii) Gramercy, Pacific Soils Engineering, Inc. ("Pacific Soils") and Southwestern Equipment LLC filed an involuntary petition against SunCal McSweeny; and (iii) Gramercy, Pacific Soils and Pacific Advanced Civil Engineering, Inc. filed an involuntary petition against SunCal Summerwind.

On September 29, 2008, (i) Weston/Mason Marketing joined as a petitioning creditor in

6. According to the PACER dockets for these cases, summons were issued with respect to the Involuntary Petitions on September 25, 2008; upon information and belief, the Involuntary Debtors have not been served with the summons, as required by Bankruptcy Rule 1010; and the Involuntary Debtors have not answered the Involuntary Petitions.

### The SunCal Companies

7. The First Lien Agent understands that: the SunCal Companies were California's largest private developer of master-planned communities, specializing in large scale mixed-use and re-use development projects; as part of their businesses; the SunCal Companies historically acquired and developed large-scale development sites for sale to leading homebuilders and commercial developers; and the SunCal Companies have more than 250,000 residential lots and 10,000,000 square feet of commercial space in various stages of development throughout more than 50 projects.

### SunCal's Credit Agreements

8. Prior to the Involuntary Petition Dates, the Involuntary Debtors owed directly, or as guarantors, at least $404 million secured by collateral with respect to which the First Lien Agent hereby seeks relief from the automatic stay.[7] This $404 million in debt represents three secured financing facilities under the Credit Agreements between SunCal and its affiliates and various lenders, as described below.[8] These lenders

---

connection with the involuntary petition filed against SunCal McSweeny; and (ii) Van Dyke Landscape Architect joined as a petitioning creditor in connection with the involuntary petition filed against SunCal Summerwind.

[7] The collateral securing the Involuntary Debtors' obligations under the Credit Agreements, include: the Debtor Guarantors' fee interest in SunCal Real Property (as defined below) and related personal property; SunCal's rights in a development account (the "Development Account"), deposit accounts and securities accounts; the Involuntary Debtors' interests in developer agreements, purchase agreements, homebuilder subordination agreements, recognition agreements, non-disturbance agreements and attornment agreements (collectively, the "Collateral") collaterally assigned to the Involuntary Debtors by various parties. See First Lien Credit Agreement, §1; See First Lien Guarantee and Collateral Agreement (the "First Lien Guarantee and Collateral Agreement"), dated as of January 19, 2006, made by the SunCal Companies in favor of the First Lien Administrative Agent, §3.

[8] As of the Involuntary Petition Dates, the aggregate principal balance owed under the Credit Agreements totaled approximately $389 million, plus approximately $15 million in interest and legal fees owed to the First Lien Lenders under the First Lien Credit

contractually agreed as to their relative rights and priorities in the Collateral also as described below.

### A. The First Lien Credit Agreement

9. As of the Involuntary Petition Dates, SunCal was a party to the First Lien Credit Agreement with the First Lien Lenders, LBI, and the First Lien Agent. The First Lien Credit Agreement provides for, *inter alia*, (i) a revolving credit facility and letters of credit in the maximum amount of $75 million and (ii) a term loan facility in the amount of $160 million. Obligations arising under the First Lien Credit Agreement are direct obligations of SunCal and are secured by the Collateral. *See* First Lien Guarantee and Collateral Agreement, §3.

10. SunCal's obligations under the First Lien Credit Agreement are guaranteed by each of the Debtor Guarantors, SunCal Patterson, and the SunCal Parents, pursuant to the First Lien Guarantee and Collateral Agreement.

11. To secure their obligations under the First Lien Guarantee and Collateral Agreement, each of the Guarantors entered into a separate First Lien Deed of Trust, Security Agreement, Assignment of Leases and Rents, and Fixture Filings (the "Security Agreements"), dated as of January 19, 2006 (as amended) in favor of Fidelity National Title Insurance Company ("Fidelity") as trustee for the use and benefit of LCPI, as administrative agent for the First Lien Lenders.[9] The Security Agreements grant LCPI, as agent to the First Lien Lenders, *inter alia*, security interests in (i) SunCal McAllister's fee interest in the real property known as McAllister Ranch, in or near Bakersfield (Kern County), California; (ii) SunCal McSweeny's fee interest in real property known as McSweeny Farms, in or near Hemet (Riverside County), California; and (iii) SunCal Summerwind's fee interest in real property known as Summerwind Ranch, in or near Calimesa (Riverside County), California (collectively, the "SunCal Real Property").[10]

---

Agreement. It is unclear as to how much is owed to the Second Lien Lenders and the Third Lien Lenders on account of interest and/or legal fees.

[9] Fidelity was subsequently replaced as trustee under the Security Agreements by Chicago Title Insurance Company.

[10] The Debtor Guarantors also issued certain other ancillary security instruments to the

Additionally, each of the SunCal Parents pledged their equity interests in SunCal as security for SunCal's performance under the First Lien Credit Agreement. *See* First Lien Guarantee and Collateral Agreement, §3. The various security interests, pledges and deeds of trust were properly perfected as summarized on the attached Exhibit A.

12. As of the Involuntary Petition Dates, approximately $244 million of total indebtedness was owed to the First Lien Lenders by SunCal under the First Lien Credit Agreement, including principal, interest and legal fees.

B. The Second Lien Credit Agreement[11]

13. As of the Involuntary Petition Dates, SunCal was also party to the Second Lien Credit Agreement among SunCal, the Second Lien Lenders, LBI and Gramercy, as administrative agent to the Second Lien Lenders. The Second Lien Credit Agreement provides for, *inter alia*, a term loan facility in the amount of $85 million. SunCal's obligations under the Second Lien Credit Agreement are guaranteed by each SunCal affiliate who guaranteed SunCal's obligations in connection with the First Lien Credit Agreement. SunCal's obligations under the Second Lien Credit Agreement are also secured by the same Collateral which secures its obligations under the First Lien Credit Agreement.

---

First Lien Agent, including deposit account control agreements and collateral assignments, to secure their obligations under the First Lien Credit Agreement. As security for its obligations under the First Lien Guarantee and Collateral Agreement, SunCal Patterson collaterally assigned to the First Lien Agent its interest in SunCal Patterson's option to purchase real property known as Patterson Ranch, in or near Oxnard (Ventura County), California. See First Lien Collateral Assignment of Option Agreement and Deed of Trust (the "Option Agreement"), dated as of January 19, 2006 (as amended), by SunCal Patterson in favor of the First Lien Agent. Upon information and belief, the optionor under the Option Agreement is in the process of terminating the agreement, as a result of SunCal Patterson's failure to make payments as required thereunder. As noted above, an involuntary petition was not filed against SunCal Patterson.
Under the First Lien Credit Agreement, the First Lien Lenders were also granted mortgages on real property from other non debtor entities.

[11] The obligations under each of the Credit Agreements are evidenced by substantially identical documents, as the documents are of the same form, differing only with respect to loan amounts and necessary changes to reflect the different lien priorities. However, unlike the First Lien Credit Agreement and the Second Lien Credit Agreement, interest under the Third Lien Credit Agreement is not paid on a current basis, but rather on an accrual basis.

14.    As of the Involuntary Petition Dates, the amount of indebtedness owed by SunCal to the Second Lien Lenders under the Second Lien Credit Agreement totaled approximately $85 million, not including accrued interest and legal fees.

C.    The Third Lien Credit Agreement

15.    In addition to the First and Second Lien Credit Agreements, as of the Involuntary Petition Dates, SunCal was also a party to that certain Third Lien Credit Agreement, dated as of January 19, 2006 (as amended), among SunCal, a syndicate of financial institutions (collectively, the "Third Lien Lenders"), LBI and Square Mile, as administrative agent to the Third Lien Lenders (the "Third Lien Credit Agreement"). The Third Lien Credit Agreement provides for, *inter alia*, a term loan facility in the amount of $75 million. SunCal's obligations under the Third Lien Credit Agreement are guaranteed by each of SunCal's affiliates who guaranteed SunCal's obligations in connection with the First and Second Lien Credit Agreements. SunCal's obligations under the Third Lien Agreement are also secured by the same Collateral which secures its obligations under the First and Second Lien Credit Agreements.

16.    As of the Involuntary Petition Dates, the amount of indebtedness owed by SunCal to the Third Lien Lenders under the Third Lien Credit Agreement totaled approximately $75 million, not including accrued interest and legal fees.

D.    The Intercreditor Agreement

17.    In connection with the Credit Agreements, the First Lien Agent, Second Lien Agent and Third Lien Agent entered into that certain Amended and Restated Intercreditor Agreement (the "Intercreditor Agreement"), dated as of February 6, 2007, governing their respective rights and the rights of their respective lenders in connection with all of the Collateral securing SunCal's obligations under the Credit Agreements. Pursuant to the Intercreditor Agreement, the Second Lien Agent and the Third Lien Agent (on behalf of themselves and the Second Lien Lenders and Third Lien Lenders, respectively) agreed, among other things, that (i) liens on any Collateral securing obligations under the First Lien Credit Agreement would be senior and prior to any liens on the Collateral securing

obligations under the Second Lien Credit Agreement and Third Lien Credit Agreement; (ii) they would not seek to exercise any rights or remedies with respect to any of the Collateral, until the discharge of the obligations owed to the First Lien Lenders under the First Lien Credit Agreement; and (iii) they would not contest or object to any foreclosure proceeding or action by the First Lien Agent. *See* Intercreditor Agreement, §§ 2.1(a)(i) and 3.1(a)(1) and (2).

### E. Other Secured Claims of the SunCal Companies

18. In addition to the security interests held by the First Lien Agent, Second Lien Agent, and Third Lien Agent, on behalf of their respective lenders, certain of the Involuntary Debtors' assets are subject to statutory liens, including liens held by various taxing authorities and vendors as mechanics' liens. As of April 23, 2008, these statutory lienholders held statutory liens against the SunCal Real Property in an approximate aggregate amount of $46.5 million.[12] Upon information and belief, the Debtor Guarantors have not satisfied amounts owed with respect to these liens and, as a result, the liens are continuing to accrue interest.

19. Upon further information and belief, certain personal property assets of the Debtor Guarantors are subject to security interests. These secured amounts are *de minimis*, however, in comparison to the statutory liens held on the SunCal Real Property.

### F. SunCal's Default Under the Credit Agreements and the First Lien Lenders' Foreclosure Action

20. On March 31, 2008, SunCal failed to make payments of interest due under the First Lien Credit Agreement. Thereafter, additional events of default occurred under each of the First Lien Credit Agreement, Second Lien Credit Agreement and the Third Lien Credit Agreement, including SunCal's (i) failure to pay a $100,000 annual

---

[12] Taxing authorities currently hold $13,704.03 in liens against the SunCal Real Property. Vendors also assert $46,531,555.10 of mechanics' liens against the SunCal Real Property. Nothing in this Motion or Memorandum is intended, or should be construed as, an admission with respect to the validity, enforceability, priority, perfection or amount of any asserted tax claim or lien or mechanics' lien.

administration fee due on April 3, 2008; (ii) failure to maintain at least $50 million[13] on deposit in the Development Account established pursuant to the Credit Agreements;[14] (iii) failure to comply with financial covenants relating to minimum liquidity; and (iv) failure to timely deliver financial statements. These and other defaults exist and are continuing under the First Lien Credit Agreement.

21. In recognition of these events of default, the First Lien Agent took steps to exercise the First Lien Lenders' rights and remedies against the Collateral. Specifically, on April 7, 2008, the First Lien Agent provided notice to the Second Lien Agent and the Third Lien Agent of its intent to exercise remedies as result of SunCal's events of default under the First Lien Credit Agreement, and on April 14, 2008, provided notice to SunCal and the Debtor Guarantors that an event of default had occurred and the obligations due under the First Lien Credit Agreement were accelerated. The First Lien Agent also commenced non-judicial foreclosure proceedings under California state law with respect to the First Lien Lenders' Collateral. Foreclosure sales of the Collateral were scheduled for August 22, 2008. Copies of these notices are attached hereto as Exhibit B.

22. In January 2008, the First Lien Agent, Second Lien Agent and Third Lien Agent commenced negotiations that may have obviated the need for the First Lien Lenders' foreclosure sales. To allow more time for these negotiations, the foreclosure sales were postponed from their original date of August 22, 2008 to September 12, 2008.

23. These negotiations were not, however, successful, and as noted above, not more than two days before, and in three of these cases closer to one day before the

---

[13] Pursuant to that certain Fourth Amendment and Waiver of the First Lien Credit Agreement, dated as of January 31, 2008, among SunCal and the First Lien Agent, Second Lien Agent and Third Lien Agent, on behalf of their respective lenders, the amount of cash required to be held by SunCal in the Development Account was increased from $25 million to $50 million.

[14] Funds in the Development Account are used (i) to pay for costs and expenses contemplated by development budgets approved by the First Lien Lenders, Second Lien Lenders and Third Lien Lenders; (ii) to repay and prepay loans made under the Credit Agreements; and (iii) to make payments of dividends and payments on account or in respect of the capital stock of the Involuntary Debtors, subject to the terms of the Credit Agreements. The Development Account cannot be accessed by the Involuntary Debtors and, as otherwise noted, is pledged as Collateral for amounts owing to the First Lien Lenders.

rescheduled foreclosure sales, the Second Lien Agent, individually and in conjunction with certain other creditors commenced involuntary chapter 11 cases against the Involuntary Debtors.

24. In response to the immediate imposition of the automatic stay upon the filing of the involuntary petitions, 11 U.S.C. §362(a), the First Lien Agent did not continue with the foreclosure sales scheduled for September 12, 2008. Instead, it has postponed those sales to the day following the hearing on the Motion, in the hope that this Court will grant the stay relief requested in the Motion.[15]

G. Value of Collateral

25. Although the Collateral securing the obligations owed to the First Lien Lenders is varied, as a practical matter, the value of that Collateral inheres in the Involuntary Debtors' real property holdings and cash collateral being held in the Development Account. In the absence of there being value in the SunCal Real Property above the amount owed to the First Lien Lenders, the independent value of any "intangible" assets or personal property associated with those real estate development projects is negligible and practically indistinguishable from the value of the SunCal Real Property. As of March 31, 2008, the SunCal Real Property was valued at $180.7 million by Cushman & Wakefield of California, Inc. ("Cushman") on an as-is basis. In addition, as of that date, there remained approximately $20.7 million in the Development Account. The Development Account, however, currently contains approximately $18 million. At inception of the First Lien Credit Agreement, the SunCal Real Property was valued at $403 million[16] and the amount in the Development Account was $25 million, representing a decline in value of these assets of more than 55%. As noted above, the total amount of indebtedness owed under the First Lien Credit Agreement is approximately $244 million.

---

[15] The First Lien Agent had further rescheduled the foreclosure sales from September 12, 2008 to October 14, 2008. As noted above, however, the First Lien Agent has tentatively rescheduled the sales to a date following this Court's disposition of the Motion.

[16] The appraisal breakdown is as follows: SunCal McAllister valued at $191.5 million as of August 17, 2005, SunCal McSweeny valued at $96.7 million as of September 7, 2005, and SunCal Summerwind valued at $114.8 million as of August 11, 2005.

26. Because the SunCal Real Property is largely undeveloped,[17] the Involuntary Debtors will need to expend funds to ensure that the value of the property does not continue to decline from neglect, even if the property is not going to be developed at this time and even assuming that the general decline in real estate values has abated (which does not appear to be the case). The expenditures associated with maintaining the SunCal Real Property in its current physical state include, among other things, expenditures for (i) erosion control; (ii) maintenance of existing landscaping and improvements; (iii) security, including maintaining fencing around the property; (iv) liability and property insurance; and (v) maintaining entitlements and permits that currently exist, and obtaining additional entitlements and permits that may be needed for the property, including but not limited to, entitlements and permits for grading and changes to land use.

## Relief Requested and Reasons Therefor

27. By the Motion, the First Lien Agent, on behalf of the First Lien Lenders, respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit C, pursuant to section 362(d) of the Bankruptcy Code and Bankruptcy Rule 4001, granting the First Lien Lenders relief from the automatic stay to foreclose on the Collateral.

28. Section 362(d) of the Bankruptcy Code authorizes this Court to grant a party in interest relief from the automatic stay (i) for cause, including where the debtor has failed to provide adequate protection to such party on account of its interest in property held by the debtor; or (ii) in situations where the debtor does not have equity in the property for which stay relief is being sought, and such property is not necessary to an effective reorganization. *See* 11 U.S.C. §362(d).[18]

---

[17] Other than a golf club and welcome center located on McAllister Ranch, which are not being used but being maintained for future use, the only improvements to the SunCal Real Property consist of pre-development work including, but not limited to, street grading, street curbs, and lighting.

[18] Specifically, section 362(d) of the Bankruptcy Code provides in pertinent part that:
On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . .
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

H. Cause Exists to Grant the First Lien Agent Relief from the Automatic Stay

29. More than sufficient "cause" exists to grant the First Lien Lenders relief from the automatic stay, including, but not limited to the lack of adequate protection for the First Lien Lenders' interest in the Collateral, the Involuntary Debtors' lack of equity in the Collateral and the lack of a reorganization being reasonably "in prospect."

*a. The First Lien Lenders' Interest In the Collateral Is Not Being Adequately Protected and Is Not Likely to Be Protected by the Involuntary Debtors*

30. As demonstrated above, the First Lien Lenders' Collateral has and is continuing to diminish in value. First, as a result of external economic conditions, the value of the SunCal Real Property has declined by more than $212.3 million in a little more than two years based on appraised values. There is no indication that these real estate values have ceased to decline. Second, as described above, statutory lienholders - specifically the taxing authorities - have lien interests senior to the First Lien Lenders in the Collateral. These interests grow every day and are continuing to accrue interest because the claims of these lienholders have not been paid; thereby necessarily diminishing the First Lien Lenders' interest in their Collateral. 11 U.S.C. §506(c). Third, to maintain the current physical condition of the SunCal Real Property, the Involuntary Debtors will be required to make a number of ongoing and costly expenditures, expenditures which SunCal cannot pay. Indeed, over a four month period covering May 2008 through August 2008, the Involuntary Debtors, having received required lender consent for budgets submitted in accordance with the various Credit Agreements, spent approximately $2.1 million in funds from the Development Account simply to protect the SunCal Real Property from physical deterioration.[19] As noted above, the Development Account is collateral for amounts owed to the First Lien Lenders.

---

(2) with respect to a stay of an act against property . . . if –
   (A) the debtor does not have an equity in such property; and
   (B) such property is not necessary to an effective reorganization . . . .
11 U.S.C. §362(d).

[19] As noted above, expenditures from this account are subject to prior approval by the First Lien Agent.

31. Because the First Lien Lenders' interest in its Collateral is diminishing, the First Lien Lenders unequivocally are entitled to adequate protection that compensates them for the decline of their interest in the Collateral if their collection efforts are to remain subject to the automatic stay. *See United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 484 U.S. 365, 374-75 (1988) *See In re Gunnison Cent. Apts.*, LP, 320 B.R. 391, 396 (Bankr. D. Colo. 2005). In determining whether a secured creditor's interests are being adequately protected, the Ninth Circuit Court of Appeals considers, among other things, the amount of debt owed to the secured creditor supported by the collateral (as of the commencement of the case). *See Stewart v. Gurley*, 745 F.2d 1194, 1195-96 (9th Cir. 1984). Adequate protection is typically granted to secured creditors in the form of cash payments or replacement liens in post-petition assets. *See* 11 U.S.C. 361.

32. In this case, however, there can be no real dispute that the Involuntary Debtors are unable to provide adequate protection to the First Lien Lenders. The Involuntary Debtors are generating no income; they have no or at best few unencumbered assets and cash; and as a result, they cannot fund their operations, maintain the SunCal Real Property, fund these chapter 11 cases or provide adequate protection payments to the First Lien Lenders.

33. Under these circumstances, relief from stay must be granted pursuant to section 362(d)(1) of the Bankruptcy Code. The First Lien Agent, on behalf of the First Lien Lenders, is entitled to adequate protection and it cannot be provided.

    b. *The Involuntary Debtors Lack Equity In the Collateral and No Reorganization Is In Prospect; Stay Relief Thus Is Appropriate Under Section 362(d)(2)(B) of the Bankruptcy Code.*

34. The value of the Collateral is undeniably less than the amounts owed to the First Lien Lenders. Moreover, before the Involuntary Debtors could enjoy any "equity" in the Collateral, at the very least, the Second Lien Lenders' and the Third Lien Lenders' claims would have to be covered by the value of the Collateral. As noted above, the current appraised value of the SunCal Real Property plus the amount in the Development

Account totals approximately $199 million. The amount owing to the First Lien Lenders is approximately $45 million more than that, and when the amounts owed to the First Lien Lenders are aggregated with the amounts owed to the Second and Third Lien Lenders (inclusive of principal only), the amount of interests secured by the Collateral is approximately $404 million or nearly $204 million more than the recently appraised value of the Collateral. Clearly, the Involuntary Debtors have no equity in the Collateral. 11 U.S.C. §362(d)(2)(A).

35. Furthermore, there should be no dispute about whether these Involuntary Debtors can propose a confirmable plan of reorganization within a reasonable period of time. They cannot. There is no known or apparent external funding available to the Involuntary Debtors in the form of debt or equity to complete the projects or fund an exit from chapter 11. In addition, the projects are not themselves producing any revenue upon which the day-to-day of a chapter 11 can be funded or ultimately a plan of reorganization could be based. There is no rational basis upon which to conclude that these circumstances will change in the reasonably foreseeable future. As a result, the Involuntary Debtors can not satisfy the varied requirements of section 1129 of the Bankruptcy Code to confirm a reorganization plan in a reasonable period of time. Thus, while the Collateral obviously would be important to any theoretical plan of reorganization that might be proposed for these estates, the Collateral is not necessary for a reorganization that is "in prospect." *In re Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. at 375-76.

        c.    *The Second Lien Lenders' Bad Faith Filings Constitute "Cause" to Grant the First Lien Agent Relief from the Stay*

36. Additionally, stay relief is appropriate under section 362(d)(1) of the Bankruptcy Code because the Second Lien Agent orchestrated the filing of the involuntary cases in bad faith. At the time that the involuntary cases were commenced, the Second Lien Agent knew or reasonably should have known that:

- The Involuntary Debtors have no equity in the Collateral.

- The Involuntary Debtors have little or no unencumbered cash on hand and are not generating cash to fund any chapter 11 case.
- Expenditures are required to maintain the SunCal Real Property.
- The Involuntary Debtors have no access to external funding to maintain the SunCal Real Property or to pay for any chapter 11 case.
- There is no reasonable expectation that the Involuntary Debtors' real estate projects will start to generate revenue in the near term to fund operations/expenses or fund an exit from chapter 11.
- The Second Lien Lenders were contractually obligated not to exercise any rights with respect to the Collateral until the First Lien Lenders are fully paid.

37. Furthermore, the Second Lien Agent and the other petitioning creditors, who initially commenced these cases, cannot dispute that they knew that the rescheduled foreclosure sales by the First Lien Agent were about to take place when they filed the Involuntary Petitions. Indeed, it is nearly impossible to believe that Gramercy (who clearly had knowledge of the impending sales) did not inform them of the First Lien Agent's foreclosure actions.

38. Where a creditor causes an involuntary case to be commenced on the eve of a foreclosure knowing, in effect, that there is no ability for the involuntary debtor to provide adequate protection, that the involuntary debtor has no equity in the collateral subject to the foreclosure, and that there is no reasonable expectation that a confirmable reorganization plan can be proposed for or by the involuntary debtor, that creditor must be presumed to have initiated the involuntary case in "bad faith."

39. The "bad faith" commencement of an involuntary case constitutes "cause" under section 362(d)(1) of the Bankruptcy Code justifying stay relief. *See In re Springs Hospitality, Inc.*, 2006 WL 2458679 *8 (Bankr. D. Colo. 2006) (finding that "a bad faith filing of a bankruptcy proceeding constitutes cause of relief from the automatic stay under

Main Document    Page 19 of 20

1. 362(d)(1)") (citation omitted); *see also In re Gunnison Ctr. Apts., LP*, 320 B.R. at 400.[20]
2. This result is particularly true where an involuntary petition is filed solely to prevent other
3. creditors from foreclosing on their secured collateral. *See Springs Hospitality*, 2006 WL
4. 2458679 at *4. (finding that an involuntary petition filed to stall the secured creditor's
5. foreclosure on the debtor's property was in bad faith, entitling the movant to relief from the
6. automatic stay); *see e.g. In re Rule, Ltd.*, 41 B.R. 153, 156 (Bankr. D. Haw. 1984) (court
7. lifting the automatic stay to allow the county to proceed with foreclosure sale upon finding
8. that the involuntary chapter 11 petition was not filed in good faith but was filed by the
9. petitioning creditor merely to delay a scheduled foreclosure sale).

### Notice

40.  Notice of the Motion has been given to (i) counsel for the Involuntary Debtors; (ii) counsel for each of the creditors listed on the Involuntary Petitions; and (iii) the United States Trustee for this District. The First Lien Agent submits that no further notice need be given.

### No Prior Application

41.  No previous application for the relief sought by the Motion and herein has been made to this or to any other court.

\\\
\\\
\\\

---

[20] Because the Bankruptcy Code does not define "cause" for the purpose of granting stay relief under section 362(d)(1) courts routinely assess the totality of the circumstances on a case by case basis in considering a request for stay relief for cause. *See In re A. Partners, LLC*, 344 B.R. 114, 127 (Bankr. E.D. Cal. 2006) (citing *In re Indian River Estates, Inc.*, 293 B.R. 429, 433 (Bankr. N.D. Ohio 2003)); *see also In re Madison Hotel Corp.*, 175 B.R. 94, 97 (Bankr. N.D. Ala. 1994) (noting that cause under section 362(d)(1) is not limited to a lack of adequate protection).

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

808092.01/LA

-17-

WHEREFORE, because the grounds for stay relief are clear under both section 362(d)(1) and section 363(d)(2) of the Bankruptcy Code, the First Lien Agent requests entry of the order attached hereto as Exhibit C granting the relief requested in the Motion and herein and such other and further relief as is just.

Dated: October 2, 2008

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
DAVID R. ZARO

By: /S/
DAVID R. ZARO
Counsel for Lehman Commercial Paper Inc., as First Lien Administrative Agent for the First Lien Lenders
-and-

CADWALADER, WICKERSHAM
& TAFT LLP
GEORGE A. DAVIS

By: /S/
GEORGE A. DAVIS
ANDREW M. TROOP
Counsel for Lehman Commercial Paper Inc., as First Lien Administrative Agent for the First Lien Lenders