1  David R. Zaro (CA Bar No. 124334)
   Email:dzaro@allenmatkins.com
2  Yale K. Kim (CA Bar No. 188895)
   Email: ykim@allenmatkins.com
3  ALLEN MATKINS LECK GAMBLE
   MALLORY & NATSIS LLP
4  515 South Figueroa Street, 9th Floor
   Los Angeles, CA 90071-3398
5  Telephone: (213) 622-5555
   Facsimile: (213) 620-8816
6
   - and -
7
   George A. Davis (NY Bar No. 2761)
8  Email: george.davis@cwt.com
   Andrew M. Troop (NY Bar No. 04556320)
   Email: andrew.troop@cwt.com
9
   CADWALADER, WICKERSHAM & TAFT LLP
10 One World Financial Center
   New York, New York  10281
11 Telephone:  (212) 504-6000
   Facsimile:  (212) 504-6666
12
   Counsel for Lehman Commercial Paper Inc.,
   as First Lien Administrative Agent for the First Lien Lenders
13
                UNITED STATES BANKRUPTCY COURT
14              CENTRAL DISTRICT OF CALIFORNIA
                     SANTA ANA DIVISION
15
   **In re:**                              **Case No. 8:08-15637 (ES)**
16
   **LBREP/L-SunCal McAllister Ranch I LLC,**   **Chapter 11**
17              **Debtor.**
                                            **RESERVATION OF RIGHTS AND**
18                                          **OBJECTION BY THE FIRST LIEN**
                                            **LENDERS TO PETITIONING**
19                                          **CREDITORS' MOTION TO APPOINT**
                                            **INTERIM CHAPTER 11 TRUSTEE**
20
                                            Date:  October 23, 2008
21                                          Time:  2:00 p.m.
                                            Place:  Courtroom 5A
22                                                  411 W. Fourth Street
                                                    Santa Ana, CA 92701
23                                          Judge:  Hon. Erithe A. Smith
24
25
26
27
28

USActive 14277494.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Introduction

1.    In the Petitioning Creditors'[1] Motion to Appoint Interim Chapter 11 Trustee (the "Trustee Motion"), the Petitioning Creditors seek the appointment of an interim chapter 11 trustee before an order for relief is entered in these involuntary reorganization cases, effectively alleging that because certain of the direct and indirect equity owners of the alleged debtors in these cases, the administrative agent for the holders of first liens (the "First Lien Lenders") on substantially all of the alleged debtors' property and one lender in each tranche of the alleged debtors' secured debt, while legally distinct with their own duties and responsibilities, are in a generic sense members of the same corporate family, the alleged debtors are incapable of making independent decisions in connection with these cases, and in particular the pending motion for relief from stay filed for the benefit of the First Lien Lenders.

2.    The simple "corporate familial" relationships alleged by the Petitioning Creditors, however, are insufficient to support the appointment of a chapter 11 trustee.  Indeed, on the facts of these cases, it is clear that the First Lien Lenders have taken extraordinary steps to insure that the alleged debtors are, if they so chose, able to respond – even oppose – the First Lien Lenders' pending motion for relief from stay and/or the involuntary petitions by exercising their own independent judgment.  Moreover, for overriding practical reasons, a chapter 11 trustee should not be appointed: there is no reasonable chance that these alleged debtors can be reorganized;

---

[1] For the purpose of this pleading, "Petitioning Creditors" means (i) John D. Scripter d/b/a Mason Plus ("Mason Plus"), Klassen Corporation ("Klassen") and Landscape Development, Inc. ("LDI") with respect to the involuntary petition filed against SunCal McAllister; (iii) Pacific Soils Engineering, Inc. ("Pacific Soils"), Southwestern Equipment LLC ("Southwestern") and Weston/Mason Marketing ("Weston Mason") with respect to the involuntary petition filed against SunCal McSweeny; and (iii) Pacific Soils, Pacific Advanced Civil Engineering, Inc. (Pacific Advanced) and Van Dyke Landscape Architect ("Van Dyke") with respect to the involuntary petition filed against SunCal Summerwind. These entities include all of the parties who filed, and certain of the additional parties joining in, the involuntary petitions described below other than Gramercy Warehouse Funding I LLC ("Gramercy").

It is interesting to note that Gramercy has not joined in this request for the appointment of an interim trustee, although on information and belief, Gramercy was fundamental in coordinating the commencement of these cases.  No reason is given for Gramercy's failure to join in the request for this relief.

there are no unencumbered assets to fund the expenses of chapter 11; and there is no source of adequate protection either for the use of cash collateral or to compensate the First Lien Lenders for the declining value to their collateral.  Accordingly, the Trustee Motion should be denied.

<u>Relevant Facts</u>

3.      The following limited facts are most salient for disposition of the Trustee Motion:[2]

4.      Suncal is party to three separate secured credit agreements:   (i) the First Lien Credit Agreement, dated as of January 19, 2006 (as amended) (the "First Lien Credit Agreement"), among Lehman Commercial Paper Inc. ("LCPI" or the "First Lien Agent") in its capacity as administrative agent to a syndicate of financial institutions (collectively, the "First Lien Lenders"), the First Lien Lenders, Lehman Brothers Inc. ("LBI"),[3] and SunCal; (ii) the Second Lien Credit Agreement, dated as of January 19, 2006 (as amended), among SunCal, a syndicate of financial institutions (collectively, the "Second Lien Lenders"), LBI, and Gramercy Warehouse Funding I LLC ("Gramercy" or the "Second Lien Agent"), as administrative agent to the Second Lien Lenders (the "Second Lien Credit Agreement"); and (iii) the Third Lien Credit Agreement, dated as of January 19, 2006 (as amended), among SunCal, a syndicate of financial institutions (collectively, the "Third Lien Lenders"), Square Mile Structured Debt (One) LLC and Square Mile Structured Debt (Two) LLC, as administrative agent to the Third Lien Lenders (collectively, "Square Mile" or the "Third Lien Agent") and LBI (the "Third Lien Credit Agreement", together with the First Lien Credit Agreement and the Second Lien Credit Agreement, the "Credit Agreements").

---

[2] A more detailed description of the factual background and events that preceded the filing of involuntary petitions against LBREP/L-SunCal Master I LLC ("SunCal"), LBREP/L-SunCal McAllister Ranch LLC ("SunCal McAllister"), LBREP/L-SunCal McSweeny Farms LLC ("SunCal McSweeny"), and LBREP/L-SunCal Summerwind Ranch LLC ("SunCal Summerwind") (the "Debtor Guarantors," together with SunCal, the "Involuntary Debtors") is set forth in the Memorandum of Points and Authorities (the "Stay Relief Memorandum") in Support of Motion of Lehman Commercial Paper Inc., as First Lien Administrative Agent for the First Lien Lenders, for Entry of an Order Pursuant to Section 362(d) of the Bankruptcy Code and Rules 4001 and 9014 of the Bankruptcy Rules Granting the First Lien Lenders Relief from the Automatic Stay to Foreclose on Their Secured Collateral (the "Stay Relief Motion"). *Docket No. 15.*  To the extent necessary to give this objection context, the Stay Relief Memorandum is incorporated herein by reference.

[3] LBI was the arranger under each of the Credit Agreements (as defined in the text).

5.    The Debtor Guarantors,[4] each of which are wholly owned subsidiaries of SunCal, issued guarantees (the "Guarantees") of the obligations owed under each of the Credit Agreements.

6.    To secure their respective obligations under the Credit Agreements and Guarantees, each Involuntary Debtor effectively pledged or mortgaged all or substantially all of its assets (collectively, the "Collateral") in favor of the First Lien Agent, the Second Lien Agent and the Third Lien Agent for the benefit of their respective constituents.  By agreement, the order of priority of interests in the Collateral is first, the First Lien Lenders, second, the Second Lien Lenders and third, the Third Lien Lenders.  Among the assets pledged as Collateral is the so-called Development Account.  Upon information and belief, the Development Account contains the only cash of any of the Involuntary Debtors.

7.    On January 19, 2006, the First Lien Agent and the SunCal Companies also entered into that an Agreement Regarding Debtor/Creditor Relationship (the "Debtor/Creditor Relationship Agreement"), which provides, inter alia, that the SunCal Companies and the First Lien Agent are separate and distinct entities, and that the relationship between the parties is one of debtor/borrower and secured creditor/lender.  A copy of the Debtor/Creditor Relationship Agreement is attached as Exhibit A.

8.    After SunCal defaulted under the First Lien Credit Agreement, foreclosure proceedings were commenced with respect to the Collateral.

9.    Although the foreclosure proceedings were postponed to permit various work-out discussions to take place, when those discussions failed, involuntary petitions were filed on the eve of the rescheduled foreclosure sales as follows:

- On September 10, 2008 (the "September 10th Petition Date"), Gramercy, in its capacity as agent for the Second Lien Lenders, filed an involuntary

---

[4] LBREP/L-SunCal Patterson Ranch LLC ("SunCal Patterson"), a non debtor entity, is also a wholly-owned subsidiary of SunCal.  SunCal's equity interests are directly owned by – SCC Ranch Ventures LLC and LBREP Lakeside SC Master I LLC (the "SunCal Parents," together with the Involuntary Debtors, the "SunCal Companies").

-4-

petition for chapter 11 relief against SunCal pursuant to section 303 of the Bankruptcy Code.

- On September 11, 2008 (the "September 11th Petition Date," collectively with the September 10th Petition Date, the "Involuntary Petition Dates"), Gramercy, in its capacity as agent for the Second Lien Lenders, in conjunction with certain trade creditors filed involuntary chapter 11 petitions (the "Guarantor Petitions," collectively with the SunCal Petition, the "Involuntary Petitions") against each of the Debtor Guarantors.[5]

10.     As of the Involuntary Petition Dates, the Collateral (including the Development Account) had an estimated aggregate "as-is" value of no more than approximately $199 million.[6] This estimated value is more than $212 million less than the estimated "as-is" value of the Collateral just two years ago.

11.     As of the Involuntary Petition Dates, the aggregate amount owed under the Credit Agreements was approximately $404 million.[7]  Of this amount, approximately $244 million is owed to the First Lien Lenders.  The First Lien Lenders, therefore, are approximately $45 million undersecured based on "as-is" appraisals.

12.     As of the Involuntary Petition Dates, all or substantially of the Involuntary Debtors assets, including cash, were subject to liens, interests and/or other encumbrances in favor of the First Lien Lenders.

13.     The Involuntary Debtors currently have no unencumbered assts or cash from which to pay for vital services for their properties which constitute Collateral, including to pay for utilities, security and soil erosion protection or to fund the expenses of a chapter 11.

---

[5]  Specifically, on the September 11th Petition Date, (i) Gramercy, Mason Plus and Klassen filed an involuntary petition against SunCal McAllister; (ii) Gramercy, Pacific Soils and Southwestern filed an involuntary petition against SunCal McSweeny; and (iii) Gramercy, Pacific Soils and Pacific Advanced filed an involuntary petition against SunCal Summerwind.

On September 29, 2008, Weston Mason joined the involuntary petition against SunCal McSweeny; LDI joined the involuntary petition against SunCal McAllister; and Van Dyke joined the involuntary petition against SunCal Summerwind.  On October 13, 2008, Superior Pipelines, Inc. also joined the involuntary petition against SunCal McAllister.

[6]  This estimate reflects actual "as-is" appraised value for real property collateral as of March 31, 2008, and the actual amount of cash in the Development Account as of October 20, 2008.

[7]  With respect to the First Lien Lenders and Second Lien Lenders, this amount does not include amounts, beyond principal, due and owing under their respective Credit Agreements.

USActive 14277494.1

14.     The real estate market in which the Involuntary Debtors' development projects are located has evaporated.

15.     None of the Petitioning Creditors or the Involuntary Debtors have identified a source of funds or assets not already pledged as collateral for the First Lien Lenders to fund (a) chapter 11 case expenses, (b) development expenses or (c) costs and expenses to exit chapter 11.

16.     The First Lien Lenders permitted $100,000 from the Development Account to be used by the Involuntary Debtors to engage legal counsel.

17.     Since the Involuntary Petition Dates, the First Lien Lenders otherwise have not consented to the use of their cash collateral or otherwise consented to withdrawals from the Development Account.

<u>The First Lien Lenders Have Empowered the Involuntary Debtors to Act In This Case</u>

18.     It is indisputable that, although they were under no obligation to do so, the First Lien Lenders authorized the release from the Development Account of $100,000 to permit the Involuntary Debtors to retain counsel of their choice to address any issue that might arise in connection with these bankruptcy cases.  No restrictions on use were placed on, or requested from, the Involuntary Debtors or counsel, in exchange for these funds.  Indeed, the Involuntary Debtors are free to use the funds to develop their own strategy for these cases, challenge or accede to the Involuntary Petitions, challenge or accede to the First Lien Lenders' Stay Relief Motion, file their own pleadings, etc.

19.     Notwithstanding this fact, the Petitioning Creditors contend that the Involuntary Debtors cannot act independently based on their own assessment of relevant issues because of a corporate familial relationship as noted above.  And, incredibly, the Petitioning Creditors point to this fact, enabling the Involuntary Creditors to retain counsel, as evidence of improper influence.  Of course, the forced inference that the Petitioning Creditors posit cannot stand up to scrutiny.  Wouldn't not funding a retainer payment have been a much more effective way to influence control over the Involuntary Debtors' conduct in these cases?  Furthermore, if funding a payment

USActive 14277494.1

to debtor's counsel by releasing collateral or an actual advance were sufficient to demonstrate a lack of independence sufficient to support the appointment of a chapter 11 trustee, then many debtors will be forced to enter chapter 11 without counsel. It is routine for secured lenders to be requested to release collateral or fund an advance to enable a debtor to retain counsel.

20.      Indeed, the only other fact upon which the Petitioning Creditors rely to infer a lack of independence is a statement in Stay Relief Memorandum that the First Lien Lenders anticipate that the Debtors will not oppose the Stay Relief Motion. In preparation of the Stay Relief Motion, the First Lien Lenders asked whether the Involuntary Debtors would oppose the motion. Indeed, in many parts of the country, such a request (and certification of the response) would be required as a prerequisite to the filing of a motion. See e.g. Local Rule 9014-1(c) (Bankr. N.D. Tx.). The fact that a question was asked and answered fails to support the appointment of a trustee.

21.      Because the two examples provided by the Petitioning Creditors fail to demonstrate a lack of independence by the Involuntary Debtors (and because there are no other examples because nothing has been done that could compromise the Involuntary Debtors' independence), the corporate relationships identified by the Petitioning Creditors do not demonstrate a conflict of interest requiring the appointment of a trustee.

<u>Without A Reasonable Likelihood For A Successful Reorganization,
There Is No Basis To Appoint A Chapter 11 Trustee</u>

22.      The appointment of a chapter 11 trustee necessarily presupposes the potential for a reorganization. In these cases, however, there is no reasonable expectation that the Involuntary Debtors can reorganize or that anyone could propose a confirmable plan of reorganization in a reasonable amount of time.

23.      There is no equity in the Involuntary Debtors' assets. There are no free assets to fund a chapter 11 case or support the exit from chapter 11. There are no free assets to compensate the First Lien Lenders for the risk that the value of their Collateral is diminishing. Indeed, the Involuntary Debtors have no cash and are generating no cash to pay for electricity, water, security or other services necessary to keep a real estate development project in tact. And,

these minimal requirements do not even begin to include the acts needed to preserve the ability to develop the projects in the future, if and when real estate markets rebound, like obtaining necessary development permits or satisfying milestones for existing building/development permits.

24. Simply put therefore, there is no rehabilitation for these debtors that can be achieved in the foreseeable future, and thus, there is no legitimate reason to appoint a chapter 11 trustee.

25. The existence of potential estate causes of action, like the potential fraudulent conveyance claims against the Involuntary Debtors' equity owners, does not change this analysis. First, a chapter 11 trustee is not required to pursue such a claim. In fact, creditors could pursue such a claim out of bankruptcy, as Gramercy has. Second, any such claim will not be resolved quickly and there can be no reasonable basis upon which to rely on any such potential claim as a source to rehabilitate the Involuntary Debtors in the reasonably foreseeable future in contrast to providing a potential recovery source for creditors at some distant point in the future.

<u>Reservation of Rights With Respect to Cash Collateral</u>

26. The First Lien Lenders do not consent to the use of cash collateral for any purpose in this case and because, as set forth above and in other pleadings filed for the First Lien Lenders, there is no adequate protection available for the use of cash collateral, the Court can not authorize its use. See 11 U.S.C. §363(c)(2).[8] Accordingly, should the Court appoint a chapter 11 trustee, the First Lien Lenders specifically reserve all of their rights with respect to the use of their cash and other Collateral by or to pay a trustee without receiving adequate protection. Courts in this Circuit and others have consistently held that the cash collateral of a secured creditor may not be used to pay professional fees unless the secured creditor is adequately protected. See <u>In re</u>

---

[8] Pursuant to Section 363(c)(2), the trustee may not use . . . cash collateral unless . . . -

(A) each entity that has an interest in such collateral consents; or

(B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section.

USActive 14277494.1

1  Proalert, LLC, 314 B.R. 436, 444 (B.A.P. 9th Cir. 2004) (finding that cash collateral may not be

2  used to pay professional fees unless the secured creditor is adequately protected); see also In re

3  Tri-County Water Ass'n, Inc., 91 B.R. 547, 550 (Bankr. D. S.D.1988) (finding that a motion for

4  use of cash collateral to pay attorney's fees triggers the secured creditor's right to have its interest

5  adequately protected).

6         WHEREFORE, for all the reasons set forth above, this Court should deny the

7  Trustee Motion.

8                                    Notice

9         Notice of the Objection has been given to (i) counsel for the Involuntary Debtors;

10  (ii) counsel for each of the Petitioning Creditors and creditors joining in the involuntary cases;

11  (iii) parties requesting notice in these cases; and (v) the United States Trustee for this District.

12  The First Lien Agent submits that no further notice need be given.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USActive 14277494.1

Dated:    October 22, 2008
          Los Angeles, California

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP

*/s/ Yale K. Kim*
David R. Zaro (CA Bar No. 124334)
Yale K. Kim (CA Bar No. 188895)
515 South Figueroa Street, 9th Floor
Los Angeles, CA 90071-3398
Telephone: (213) 622-5555
Facsimile: (213) 620-8816

-and-

CADWALADER, WICKERSHAM & TAFT LLP

*/s/ Andrew M. Troop*
George A. Davis (NY Bar No. 2761)
Andrew M. Troop (NY Bar No. 4556320)
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

Counsel for Lehman Commercial Paper Inc.,
as Administrative Agent to the First Lien Lenders

USActive 14277494.1

**EXHIBIT A**

AGREEMENT REGARDING DEBTOR/CREDITOR RELATIONSHIP

THIS AGREEMENT REGARDING DEBTOR/CREDITOR RELATIONSHIP (this "Agreement") is made and entered into as of January 19, 2006, by LBREP/L-SUNCAL MASTER I LLC, a Delaware limited liability company (the "Borrower"), LBREP LAKESIDE SC MASTER I LLC, a Delaware limited liability company, as a member of the Borrower ("Lakeside"), SCC RANCH VENTURES LLC, a Delaware limited liability company, as a member of the Borrower ("SCC Ranch"), each subsidiary of the Borrower that is party to the Guarantee and Collateral Agreement, as defined herein (each a "Subsidiary Guarantor"; each Subsidiary Guarantor, together with Lakeside, SCC Ranch and the Borrower referred to herein, collectively, as "Borrower Parties" and each individually as a "Borrower Party"), to and for the benefit of LEHMAN COMMERCIAL PAPER INC. ("LCPI") as a Lender thereunder, as administrative agent for the Lenders and as syndication agent.

## R E C I T A L S

A.     Capitalized terms used herein and not otherwise defined herein have the meanings ascribed to them in that certain First Lien Credit Agreement, dated as of January 19, 2006, (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders parties thereto, Lehman Brothers Inc., as Arranger, LCPI, as the Syndication Agent, and LCPI, as the Administrative Agent.

B.     The Lenders have agreed to make loans in a maximum principal sum of up to Two Hundred Thirty-Five Million and No/100 Dollars ($235,000,000) to the Borrower (the "Loans"). The Loans are to be secured by the Guarantee and Collateral Agreement, the Mortgages and all other security documents delivered pursuant to the Credit Agreement to the Administrative Agent (such documents, together with the Credit Agreement and other Loan Documents evidencing and/or securing the Loans are collectively referred to herein as the "Loan Documents"). The Subsidiary Guarantors have executed the Guarantee and Collateral Agreement in connection with the Loans.

C.     The members of the Borrower have executed and delivered that certain Operating Agreement of Borrower, dated as of November 5, 2004 ("Borrower Operating Agreement"), by and among SCC Ranch and Lakeside, pursuant to which Borrower has been formed and organized.

D.     As more fully set forth in the Loan Documents, the proceeds of the Loans shall be used by the Borrower to refinance Existing Mortgage Indebtedness, finance Land Expenses, pay a dividend to certain investors, pay related fees and expenses pursuant to the Credit Agreement, and to provide for the ongoing general corporate needs of the Borrower and its Subsidiaries.

E.     The Borrower has requested that the Lenders provide financing for the purposes provided for above. LCPI is willing to extend such financing as a Lender and act as the Administrative Agent and as the Syndication Agent on behalf of the Lenders. Due to the fact that Lakeside is an affiliate of LCPI, LCPI has expressed concerns that if it provides the requested financing and acts as a Lender or acts as the Administrative Agent or the Syndication Agent pursuant to the Loan Documents, the Borrower Parties, or some of them, could, at a later

date, attempt to assert claims against LCPI, or claims or defenses designed to prevent or delay the enforcement of the Loan Documents by LCPI or others, based upon the fact that LCPI is affiliated with the Borrower.

F.     In response to LCPI's concerns and to induce LCPI to act as the Administrative Agent and the Syndication Agent and to provide such financing, the Borrower Parties have assured and agreed with LCPI that no claims or defenses will be asserted by any Borrower Party or any affiliate or entity controlled by such Borrower Party against LCPI in its capacity as a Lender, the Administrative Agent or the Syndication Agent, with respect to the Loans or any enforcement by LCPI of its rights and remedies under the Loan Documents based on the fact that an affiliate of LCPI is also an affiliate of the Borrower. The Borrower Parties desire to execute and deliver this Agreement for the benefit of LCPI to evidence such assurance and agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce LCPI to provide such financing and to act as the Administrative Agent and the Syndication Agent for the Lenders, as applicable, the Borrower Parties hereby agree to and for the benefit of LCPI as follows:

1.     Acknowledgments and Agreement. The Borrower Parties hereby acknowledge and agree as follows:

(a)     Separate and Distinct Persons. The Borrower Parties recognize, acknowledge and agree that LCPI is a wholly separate and distinct Person, separate and distinct from the Borrower. Accordingly, the Borrower Parties agree not to make or assert any claims or counterclaims of any kind or nature whatsoever against LCPI, or to raise any defenses or offsets with respect to LCPI's enforcement of the Loan Documents, that in any way assert or are based upon the contention that the relationship between LCPI and the Borrower or any of the Borrower Parties is anything other than that of an unaffiliated borrower and third party lender. The Borrower Parties agree never to institute or cause to be instituted or continue prosecution of any suit or form of action or proceeding against LCPI in its capacity as a Lender, the Administrative Agent or the Syndication Agent, as applicable, in contravention of the foregoing; provided, however, that in no event shall anything contained in this Section 1(a) or any other provision of this Agreement limit or impair any right or remedy that the Borrower Parties may have against each other including, but not limited to, any right or remedy they may have against Borrower, Lakeside or SCC Ranch, under or pursuant to the Borrower Operating Agreement, including, without limitation, any obligations of Lakeside or SCC Ranch to any of the other Borrower Parties, solely by reason of its capacity as a member in the Borrower. In addition, the Borrower Parties recognize, acknowledge and agree that none of the rights or remedies of LCPI as a Lender, the Administrative Agent or the Syndication Agent shall be affected solely due to the fact that Lakeside is an affiliate of LCPI.

(b)     Debtor/Creditor Relationship. The Borrower Parties recognize, acknowledge and agree that the relationship created between LCPI, the Borrower

and the Subsidiary Guarantors by the making of the Loans and the execution, delivery and performance of the Loan Documents is solely and exclusively that of debtor/borrower and secured creditor/lender. Nothing in the Loan Documents shall be construed to create or give rise to (i) any joint venture, partnership, tenancy-in-common, or joint tenancy relationship, or any other relationship other than debtor/borrower and creditor/lender, between or among LCPI and any of the Borrower Parties, separate and apart from any relationship among the members of the Borrower created and governed by the Borrower Operating Agreement; or (ii) any rights, duties or obligations of LCPI to any of the Borrower Parties of any kind or nature except as expressly set forth in the Loan Documents; and the Borrower Parties agree never to institute or cause to be instituted or continue prosecution of any suit or form of action or proceeding of any kind or nature whatsoever (including, but not limited to, any defenses, offsets or counterclaims) against LCPI in its capacity as a Lender, the Administrative Agent or the Syndication Agent in contravention of the foregoing.

(c)    Independent Actions.  LCPI shall have the right to take any action and to exercise any right or remedy available to it in its capacity as a Lender, the Administrative Agent or the Syndication Agent under the Loans and the Loan Documents and which is permitted under the Loan Documents, without regard to any course of action pursued by either of Lakeside or SCC Ranch under the Borrower Operating Agreement, whether consistent or inconsistent with the actions pursued by LCPI.  As separate and distinct entities, Lakeside, SCC Ranch and LCPI shall have at all times the right to act independently from each other. Any action taken by LCPI shall not be deemed or construed to be an action taken by any Borrower Party.  Any action taken by any Borrower Party shall not be deemed to be an action taken by LCPI.

(d)    Transferability.  The Borrower Operating Agreement and the Loan Documents do not restrict LCPI from transferring its interests in the Loan Documents in accordance with the terms of the Loan Documents; and, accordingly, the rights and obligations of LCPI may be transferred to other persons that are or are not affiliated with LCPI and/or Lakeside and/or SCC Ranch in accordance with the terms of such agreements.  Any assignment or other transfer by LCPI (in its capacity as agent or lender) not so in accordance shall be null and void.

(e)    (i)    Waiver.  Except as expressly provided for in the Credit Agreement, the Borrower Parties hereby waive and release any and all defenses, affirmative defenses, set-offs, claims, counterclaims or causes of action of any kind or nature which any Borrower Party may now or hereafter hold or have the right to assert on behalf of itself or any other Borrower Party against LCPI in its capacity as a Lender, the Administrative Agent or the Syndication Agent, as applicable, relating to the Loans or to the Loan Documents, or the enforcement by LCPI of its rights and remedies thereunder based upon the fact that LCPI is affiliated with Lakeside; and the Borrower Parties covenant and agree never to institute or cause to be instituted or continue prosecution of any suit or form of

action or proceeding of any kind or nature whatsoever (including, but not limited to, any defenses, offsets or counterclaims) against LCPI in its capacity as a Lender, the Administrative Agent or the Syndication Agent, as applicable, based upon the fact that Lakeside is affiliated with LCPI.

(ii)     Limitation of Certain Claims. Each of the Borrower Parties recognizes, agrees and acknowledges that, if and to the extent any Borrower Party shall hereafter assert any claims against Lakeside or SCC Ranch under or pursuant to the Borrower Operating Agreement, in no event shall LCPI have any liability for the obligations of either Lakeside or SCC Ranch thereunder.  Each Borrower Party hereby waives and releases any such claims against LCPI in its capacity as a Lender, the Administrative Agent or the Syndication Agent in contravention of the provisions of the previous sentence; and each Borrower Party covenants and agrees never to institute or cause to be instituted or continue prosecution of any suit or form of action or proceeding of any kind or nature whatsoever (including, but not limited to, any defenses, offsets or counterclaims) against LCPI in its capacity as a Lender, the Administrative Agent or the Syndication Agent in contravention of the provisions of the previous sentence.

2.     Agreement to Cooperate in Defense of Third Party Claims and Bankruptcy Waivers.

(a)     Each of the Borrower Parties hereby agrees to cooperate fully with LCPI to contest any claim or assertion by any third party in any judicial or administrative proceeding that the relationship of LCPI and the Borrower under the Loan Documents or with respect to the Loans is not solely and exclusively that of debtor/borrower and creditor/lender.

(b)     Each Borrower Party hereby agrees not to directly or indirectly assert against LCPI any claim, argument or defense, whether grounded on equitable subordination principles under Section 510 of the United States Bankruptcy Code or under any other section contained in Chapter 5 of the United States Bankruptcy Code, or otherwise, that (a) the relationship of LCPI, the Borrower and the Subsidiary Guarantors as evidenced by the Loan Documents is not solely and exclusively that of debtor/borrower and creditor/lender or (b) the liens and security interests granted to LCPI in its capacity as the Administrative Agent on behalf of the Secured Parties in the Collateral as security for the Loans are not fully perfected and enforceable first-priority liens and security interests, in each case based upon the fact that LCPI is affiliated with the Borrower Parties. Nothing contained herein shall operate as a wavier of, or modification to, any other right, power or remedy of any Borrower Party under applicable law with respect to any Loan Document, the Borrower Operating Agreement or otherwise, except as expressly provided herein.

3.     Material Inducement.  The Borrower Parties acknowledge and agree that the acknowledgments, covenants, waivers, agreements and releases contained in this Agreement constitute a material inducement for LCPI to make the Loans to the Borrower, and act as the

Administrative Agent and the Syndication Agent, for the Lenders and to enter into the Loan Documents and that, but for the execution and delivery of this Agreement by the Borrower Parties, LCPI would not make Loans to the Borrower, act as the Administrative Agent or the Syndication Agent for the Lenders or enter into the Loan Documents. Each of the Borrower Parties hereby further agrees that each and every event and circumstance hereafter occurring in which the Borrower accepts the performance by LCPI of any undertaking by it under the Loan Documents, including, without limitation, any additional fundings or draws under the Loan Documents or the releasing of Collateral for the Loans, shall be deemed to constitute the reaffirmation by the Borrower Parties of the acknowledgments, covenants, waivers and agreements of the Borrower Parties in this Agreement as of the date of such event or circumstance without any further writing being required to evidence such reaffirmation by the Borrower Parties.

4.      Successors or Assigns.  Whenever in this Agreement any Borrower Party or LCPI is named or referred to, the heirs, executors, legal representatives, successors, successors-in-title, bankruptcy trustees, bankruptcy estates, debtors-in-possession and permitted assigns of or relating to such parties shall be included, and all covenants and agreements contained in this Agreement shall bind and inure to the benefit of their respective heirs, executors, legal representatives, successors, successors-in-title, bankruptcy trustees, bankruptcy estates, debtors-in-possession and permitted assigns, whether so expressed or not.

5.      Construction of Agreement.  Each Borrower Party and LCPI acknowledges that it has participated in the negotiation of this Agreement, and no provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of any party hereto having or being deemed to have structured, dictated or drafted such provision; that each of the parties hereto at all times has had access to an attorney in the negotiation of the terms of and in the preparation and execution of this Agreement and each of the parties hereto has had the opportunity to review and analyze this Agreement for a sufficient period of time prior to the execution and delivery thereof; that all of the terms of this Agreement were negotiated at arm's-length, and that this Agreement was prepared and executed without fraud, duress, undue influence or coercion of any kind exerted by any party hereto upon the others; and that the execution and delivery of this Agreement is the free and voluntary act of each of the parties hereto.

6.      Governing Law.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

7.      Headings.  The headings of the articles, sections and subparagraphs of this Agreement are for the convenience of reference only, are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

8.      Modifications.  The terms of this Agreement may not be changed, modified, waived, discharged or terminated orally, but only by an instrument or instruments in writing, signed by the party against whom the enforcement of the change, modification, waiver, discharge or termination is asserted.

6

9.      Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument.

10.     Default under Credit Agreement. A default by any of the Borrower Parties under this Agreement shall constitute an Event of Default under the Credit Agreement after the expiration of the grace or cure period specified in Section 8(d) of the Credit Agreement.

11.     WAIVERS OF JURY TRIAL. EACH BORROWER PARTY AND LCPI HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

[Remainder of Page Intentionally Left Blank; Signatures Follow on Next Page]

NCLIB1 304964.5

IN WITNESS WHEREOF, the Borrower Parties hereto have executed and delivered this Agreement to and for the benefit of LCPI as of the day and year first above written.

BORROWER:                          LBREP/L-SUNCAL MASTER I LLC

                                   By: _____
                                        Name: Bruce Elieff
                                        Title: Authorized Signatory


SCC RANCH:                         SCC RANCH VENTURES LLC

                                   By: _____
                                        Name: Bruce Elieff
                                        Title: *Manager*

[First Lien Agreement Regarding Debtor/Creditor Relationship]

LAKESIDE:                         LBREP LAKESIDE SC MASTER I LLC

                                  By: _____
                                  Name:            Melvin T. Andrews
                                  Title:           Authorized Signatory

[First Lien Agreement Regarding Debtor/Creditor Relationship]

SUBSIDIARY GUARANTORS:

LBREP/L-SUNCAL SUMMERWIND
   RANCH LLC

By: _____
   Name: Bruce Elieff
   Title: Authorized Signatory

LBREP/L-SUNCAL PATTERSON
   RANCH LLC

By: _____
   Name: Bruce Elieff
   Title: Authorized Signatory

LBREP/L-SUNCAL MCALLISTER
   RANCH LLC

By: _____
   Name: Bruce Elieff
   Title: Authorized Signatory

LBREP/L-SUNCAL MCSWEENY
   FARMS LLC

By: _____
   Name: Bruce Elieff
   Title: Authorized Signatory

[First Lien Agreement Regarding Debtor/Creditor Relationship]

ACCEPTED BY:

ADMINISTRATIVE AGENT/           LEHMAN COMMERCIAL PAPER INC.
    SYNDICATION AGENT/
    LENDER:                     By: _____
                                    Name:
                                    Title:    Francis X. Gilhool
                                              Authorized Signatory

[First Lien Agreement Regarding Debtor/Creditor Relationship]

# PROOF OF SERVICE BY E-MAIL

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My electronic notification address is : mdiaz@allenmatkins.com.

On October 22, 2008 at 11:00 a.m., I served on the below interested party(ies) and/or their counsel(s) of record in said action the attached document(s) :

RESERVATION OF RIGHTS AND OBJECTION BY THE FIRST LIEN LENDERS TO PETITIONING CREDITORS' MOTION TO APPOINT INTERIM CHAPTER 11 TRUSTEE

by electronic mail direct to the attorney(s) of records and/or the person or persons as stated below.

| Name of Counsel(s)/Law Firm(s) | Electronic Notification Address |
|---|---|
| **Attorney for Petitioning Creditor(s)**<br>**Daniel H. Reiss, Esq.**<br>**Levene, Neale, Bender, Rankin &**<br>**Brill L.L.P.** | **dhr@lnbrb.com** |
| **Attorney for Petitioning Creditor**<br>**Thomas Scott Belden, Esq.**<br>**Klein Denatale Goldner Cooper**<br>**Rosenlieb & Kimball LLP** | **sbelden@kleinlaw.com** |

I am readily familiar with this firm's Microsoft Outlook electronic mail system and this document/these documents were duly served electronically on the date and time stated above, and the transmission was reported as complete and without error.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on October 22, 2008, at Los Angeles, California.

_____
Martha Diaz
(Type or print name)

/s/  Martha Diaz
_____
(Signature)

809865.01/LA